J-S01020-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.S.K.G. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.L.G., FATHER | : | |
| | : | |
| | : | No. 1132 WDA 2022 |

Appeal from the Order Entered August 29, 2022,
in the Court of Common Pleas of Bedford County,
Orphans' Court at No(s):  No. AD-11 2022.

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                **FILED:  March 17, 2023**

M.L.G. ("Father") appeals the orphans' court decision to terminate his parental rights to his daughter, K.S.K.G., ("the Child"), born March 2021, pursuant to the Adoption Act. **See** 23 Pa.C.S.A. § 2511(a)(8) and (b).[1]  After careful review, we affirm.

The facts and procedural history are as follows:  Shortly after the Child was born, Bedford County Children and Youth Services ("the Agency"), filed an application for emergency protective custody after receiving a report that the Child tested positive for various drugs in her system.  Thereafter, a shelter care hearing was conducted.  The court granted the Agency's request for

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On August 25, 2022, K.L.B. ("Mother") filed her consent to adoption.

shelter care and the court directed the Child to be placed in the physical custody of her maternal grandmother upon release from the hospital.

The Child was adjudicated dependent on March 25, 2021. Pursuant to a subsequent emergency protective custody order, however, the court directed that upon the Child's release from the hospital she would be placed in foster care. This change was necessitated by the fact that the maternal grandmother tested positive for illegal drugs.

A permanency plan was instituted for Father. From the date of the Child's dependency adjudication to the time of the first permanency review on August 17, 2021, Father's compliance and progress were moderate toward alleviating the circumstances which led to Child's original placement. As of that date, Father was consistent with his visitation, cooperated with the Agency and service providers, and was addressing his mental health. However, he was still experiencing difficulty managing basic life skills and was still not ready for an unsupervised visitation with the Child. Father was still not passing his drug tests but was in the process of applying for a medical marijuana card.

By the time of the next permanency review on February 1, 2022, Father was found to have had only minimal compliance and progress toward alleviating the circumstances which led to the Child's original placement. By this time, Father's visits were inconsistent, he continued to fail drug screens, was not receiving treatment for his mental health issues, and lacked appropriate housing.

By the time of the third permanency review on July 19, 2022, Father was incarcerated after his May 2022 arrest for criminal mischief and related charges. He was found to have made minimal compliance and progress with his permanency plan because he failed all his drug screens, lacked appropriate housing, and was not receiving treatment for his mental health issues.

On July 20, 2022, the Agency filed a petition to terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). The orphans' court conducted an evidentiary hearing on August 29, 2022. The Agency presented the testimony of Valerie Kinsey, the Agency's caseworker assigned to the case from its beginning, and Amanda Kendall, the Agency's caseworker who provided family preservation services to Father. Father testified on his own behalf. After hearing argument from the parties, the orphans' court provided its reasons for terminating Father's parental rights on the record. By order entered that same day, the court terminated Father's parental rights pursuant to Section 2511(a)(8) and (b). Father appealed. Both Father and the orphans' court have complied with Pa.R.A.P. 1925.

Father raises the following issue:

> Did the [orphans'] court commit an abuse of discretion or an error of law in determining that [the Agency] presented sufficient evidence to satisfy its burden of proof (clear and convincing evidence) in the bifurcated analysis to warrant the involuntary termination of [Father's] parental rights?

Father's Brief at 6.

We begin our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).  We add that we

may uphold a termination decision if any proper basis exists for the result reached. **In re C.S.**, 761 A.2d at 1201. Importantly, we need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We first address Father's claim that the Agency failed to present clear and convincing evidence to support the termination of his parental rights pursuant to Section 2511(a)(8), which provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> [...]
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

To terminate parental rights under Section 2511(a)(8), the petitioner must prove: (1) the child has been removed from parental care for 12 months or more from the date of the removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. **In re K.Z.S.**, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted). Termination

under Section 2511(a)(8) does not require the court to evaluate a parent's

current willingness or ability to remedy the conditions that initially caused the

placement, or the availability or efficacy of the services provided by the local

children and youth agency. **K.Z.S.**, 946 A.2d at 759 (citation omitted).

At the conclusion of the evidentiary hearing, the orphans' court first

noted the three elements that the Agency had the burden to prove under

Section 2511(a)(8). **See** N.T., 8/29/22, at 98; **K.Z.S.**, **supra**. The court then

provide its rationale as to each element. As to the first element, the orphans'

court reasoned:

> So, [the first element] subsection 8 [is] essentially that the
> child has been removed from parental care for twelve months or
> more from the date of the removal. [The Child] was born, I
> believe, [in March 2021]. Upon discharge - -[the Child] was never
> discharged home to the parents. I believe we, there was an []
> shelter care order prior to discharge, but essentially upon
> discharge from the hospital [the Child] has always been placed in
> the foster home of [the Foster Parents]. I would note that today's
> date is August 29, 2022. So, certainly that twelve months has
> passed.

N.T., 8/29/2, at 98-99.

The court then noted that the second element is that the conditions

which led to the placement of the Child continue to exist. The orphans' court

found that the Agency met its burden as to this element, and explained as

follows:

> So, my analysis will initially focus on whether the condition
> that led to [the Child's] placement continue to exist despite
> reasonable good faith efforts of the Agency supplied over a
> realistic period of time. And as I've stated, this case - - [the Child]
> has been in placement now for, well, close to a year and a half.

In the case at hand, I heard testimony from the caseworker, Ms. Kinsey, as well as the testimony of the Family Preservation caseworker, [Ms.] Kendall. It seems clear to me that the initial reasons as it relates to [Father], the reasons for placement, there were concerns as it relates to instability in the areas of drug use, mental health and unstable housing. So, three were essentially as it relates to [Father], the three big issues where his goals were focused around.

[The orphans' court] has noted that out of all of the drug tests, I believe it was approximately ten that were given to [Father], he unfortunately failed them all. What is of greater concern to the [court] is the trend beginning in December of 2021 until, well, the most recent attempt at a test in May . . . he tested positive, among other things, to methamphetamine, I would note that initially when the case was open and he began being tested, he was testing positive for things like marijuana and suboxone, which while concerning - - I will be very frank - - the trend toward the heavier drugs concerns the [court] much, much more. So, it would seem to [the orphans' court] as though that issue has not been resolved.

The next issue raised or concern that was raised had to do with mental health. Well, it would seem to me that unless or until [Father] is able to get his drug use under control, it will be difficult to address the mental health issues, which I think has been indicated by the various caseworkers over the last months. That has been indicated and explained to [Father]. Various options, I believe, were discussed with him, and at least until his most recent incarceration about three months ago, that he has not effectively been able to get a handle on his drug use.

Another one of the concerns was, as I said, the instability as it relates to housing. It seems to me at times [Father] has attempted to rely on his father to assist him with a residence but it seems to me that relationship at times has been quite volatile. So, the court is very concerned about that, and I don't know, nor did I hear evidence today that if [Father] would be released from incarceration sometime in the future, that he would have the ability to go back to his father's residence. I don't know that's the case. But, over the course of this case it seems as though the housing situation certainly has not improved.

Additionally, again, I do want to touch upon a little bit further [on Father's] mental health issues. [A]s I said, it would

seem to me that drug use must be resolved but the court is concerned he had in 2021, just after this case was opened, he had a mental health placement and I found his testimony credible when he said when he got out of the hospital from Pittsburgh back in June or July of 2021, that was probably the best he was doing. And I find that credible because our Permanency Review order reflected that. He wasn't fully making, fully in compliance, but he was making progress at least. And so, I take him at his word that throughout the history of this case, that's the best he had been. But, unfortunately, as I said over time instead of continuing to progress in the right direction [in] terms of both drug use and mental health treatment it just has not happened. And in the court's estimation, it has, has in fact gotten worse.

The court further notes that most recently here in May of 2022, there was testimony that [Father] had a 302 commitment at the Somerset Hospital. [Father] was well aware that upon his discharge they recommended additional follow-up, mental health treatment, but he did not do that. He did not ask for assistance to do that and in fact, refused, and said he didn't need treatment.

So, in those regards, it would seem to me that as it relates to [Father] and the concerns of the Agency and the goals that he had, despite reasonable good faith efforts of the Agency, he has not improved upon those. He has not made progress.

N.T., 8/29/22, at 99-103 (excess capitalization omitted).

Finally, the orphans' court stated why it found that the Agency met the element for termination under Section 2511(a)(8), that termination would best serve the needs and welfare of the Child:

It appears to me that the evidence has shown that through testimony of the case worker, as well as the report of the guardian ad litem, [the Child] currently is doing well in her current placement. She's happy. She's formed bonds within that family. And when I look at the bond that she has with [Father], I agree with the attorney for the Agency. I think there is a bond, but I just don't think it's outweighed by the stability that the child has currently.

N.T., 8/29/22, at 104.

Our review of the record supports the orphans' court's conclusions. In arguing to the contrary, Father first acknowledges that he "conceded during the [termination] hearing that he was not in a position to provide the care and nurturing environment that [the Child] would require." Father's Brief at 10-11. He contends, however, that his three months of incarceration, "served to afford [him] the space to clear his head and to commit to services he requires/needs in order to provide [the Child] with a safe, stable and nurturing environment." *Id.* at 11. Thus, Father asserts that "[all] he requested of the court was to be afforded an additional 3-6 months following his release to meet his goals for him and [the Child] to be reunited." *Id.*

The orphan's court was aware of Father's testimony regarding his incarceration status and his hope to meet his reunification goals upon his release. As the court explained:

> The court will also look at what's the likelihood that [Father] would make progress if we just simply give him more time. Well, unfortunately, things for [Father] seem to this court to continue to be a little up in the air. He's currently incarcerated on new charges. There is no indication of what the resolution might [be], or what the plan might be when he may be released. I know he testified that he was hoping maybe to touch base with his father. Move back in with his father, but this court is not satisfied that that even is an option at this point.

N.T., 8/29/22, at 103 (excess capitalization omitted). In essence, the orphans' court determined that the uncertainty regarding Father's release date, and ability to meet his reunification goals thereafter, supported the termination of his parental rights pursuant to Section 2511(a)(8).

The orphans' court's conclusion is consistent with pertinent case law. As noted by the guardian *ad litem*'s brief supporting termination, Father asked the orphans' court to place the Child in a "holding pattern" until he gets released from jail and can work on his reunification goals. Brief for Guardian *Ad Litem*, at 16. As our Supreme Court has previously stated, "[i]n weighing the difficult factors [relevant in a parental rights termination proceeding,] courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and courts have an obligation to see to their healthy development quickly." **T.S.M.**, 71 A.3d at 269. Moreover, it is now well settled that "[a] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **Interest of D.R.-W.**, 227 A.3d 905, 914 (Pa. Super. 2020) (citation omitted).

Based on the foregoing, we conclude: the orphans' court did not commit an error of law or abuse its discretion when it terminated Father's rights under Section 2511(a)(8). Thus, we next consider whether the record supports the orphans' court's conclusion that the Agency presented clear and convincing evidence pursuant to Section 2511(b).

Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare

of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court has explained that:

[S]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.,** 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id.** at 763.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

Concerning the bond, the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship. **See C.M.K.**, 203 A.2d at 264 (citation omitted); **see also K.Z.S.**, 946 A.2d at 764 (holding there was no bond worth preserving where the child had been in foster care for most of the child's life, which

caused the resulting bond to be too attenuated). We add, the court is not required to use expert testimony to resolve the bond analysis but may rely on the testimony of social workers and caseworkers. **Z.P.**, 994 A.2d at 1121. Finally, we emphasize that "[w]hile a parent's emotional bond with her and/or her child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." **In re N.A.M.**, 33 A.3d 95, 103 (Pa. Super. 2011) (citation omitted).

Here, at the close of testimony the orphans' court explained its rationale for concluding that the Agency met its burden of establishing termination was warranted pursuant to Section 2511(b). The court stated:

> And, as I've mentioned, it seems to me [the Child] has a particularly strong parental bond, not just a bond, but a parental bond with the foster parents. The court notes, I also heard testimony that [the Child] has what I would refer to as a sibling bond with the other children in that household.
>
> The testimony that the court particularly relies on as it relates to this subsection is the testimony of the Family Preservation caseworker, [Ms.] Kendall. She forthrightly and credibly testified as to the things that [Father] was able to do. He clearly loves [the Child]. During visits he was able to take proper care of [the Child] in terms of feeding and holding, changing [her] diaper. So, the court did recognize that, and I did consider that, but I also considered the nature of the bond that was displayed between [the Child] and [Father].
>
> So, certainly I think there is a bond but I don't know that I would characterize it, unfortunately as a parental bond. I think [the Child] has that bond with the foster parents. And I think the evidence has supported that. And I would note that parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide [the Child] with her physical, emotional needs.

So, what it really comes down to, [Father], unfortunately, is I have no doubt that you love [the Child]. You want what's best for [the Child,] but I can't put her life on hold while you [] continually try to resolve the issues that you have and I don't mean any disrespect in saying that, but I have to look at the fact[s], sir as they are today.

So, based on that, I do find that the Agency has met its burden of proof and the court will grant the Agency's petition as far as termination of parental rights.

N.T. 8/29/22, at 105-06 (excess capitalization omitted).

Our review of the record supports the orphans' court's conclusions. As noted above, we may not disturb the orphans' courts credibility determinations when they are supported by the record. *T.S.M.*, *supra*. The court found Ms. Kendall's testimony comparing the nature of the bond the Child had with Father vis-à-vis her bond with the foster parents. Ms. Kendall testified that, although she saw a bond between the Child and Father, the Child displayed the same bond toward her. *See* N.T., 8/29/22, at 38. Contrarily, Ms. Kendall testified that the Child displayed a true parental bond with both foster parents. *Id.* at 37.

Thus, Ms. Kendall's testimony establishes that the Agency met its burden of presenting clear and convincing evidence that termination of Father's parental rights pursuant to Section 2511(b) was in the Child's best interests. *See In re T.M.T.*, 64 A.3d 1119 (Pa. Super. 2013) (holding that a parent's own feelings of love and affection for a child, alone, does not prevent termination of parental rights); *In re K.M.*, 53 A.3d 781 (Pa. Super. 2012) (explaining that whether a child's primary emotional attachment is with a

foster parent rather than a birth parent is a significant factor in evaluating the child's developmental and emotional needs and welfare in a termination of parental rights proceeding).

In sum, because the record supports the orphans' court's conclusion that the Agency presented clear and convincing evidence pursuant to Section 2511(a)(8) and (b), we affirm the order terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/17/2023